We are ready for argument in our first case. Mr. Leavitt, when you are ready. Good morning, Your Honors. This case was decided below by the court after reviewing merely one and a half documents. Unfortunately, the court did not review at least nine and a half other documents that we submitted, that we respectfully submit to establish an extended course of conduct, both before and after the subcontract and the contribution agreement, and which establish an expectancy in both of the named plaintiffs. So, without further ado, if I may, I'd like to turn to those documents. So, the first document would be at the Joint Appendix No. 4890. It is a document dated August 25, 2010. It is a price analysis by Serco of an L-3 Communications proposal. Now, this is several years after the subcontract. This is a Serco document. This is an evaluation not of L-3 Serco's proposal, but of L-3 Communications' proposal. This, which means, in order for them to evaluate a proposal, they had to have invited L-3 to submit a proposal, number one. Number two, L-3 had to have submitted the proposal. So, you're arguing course of conduct? Actually, I'm arguing two things. The first I'm arguing is that the business expectancy, as can be established by the documents that I'd like to go through, shows that the expectancy did not arise under the subcontract, and that the court below respectfully got it wrong, that the expectancy could only arise out of the contract. If there are documents that show that both named plaintiffs did business with a defendant, then the expectancy couldn't be limited to the subcontract. The second thing is, even if for some reason the subcontract does, in fact, matter, which I submitted does not, I would argue course of conduct. But I don't need to, Your Honor, because business expectancy can, and in this case did, arise outside of the subcontract. The problem, though, is that the contract is very clear that any assignment has to be in writing. And so, I would infer from that that you would need to argue that there is some clear course of dealing that contradicts that, constitutes a waiver of it, that there is some action through course of conduct that allows you to assert that expectancy arises other than through the subcontract. Well, but that assumes, that is one way to look at it, Your Honor, but it assumes that the subcontract is being treated as a statute. There are many, in other words, if the two named plaintiffs You mean binding? In the sense that neither named plaintiff, okay, according to the defendants, were parties to the subcontract. If that's the case, they can't be bound by anything the subcontract says. A party who doesn't sign a contract can't be bound by an agreement it didn't sign. Well, of course it could. The subcontract provision that any modification, revision, change, waiver has to be authorized and written consent has to be given, but you can't be saying that if written consent isn't given, anyone along the line afterwards isn't bound by that when that defines the relationship of the parties going forward. I think the key, Your Honor, is what you just said, the relationship of the parties, all right? These are two people who are not parties to that contract. L3 Communications and L3 ATI, according to the defendants, were not parties to that contract. Well, how else did task orders arise? Actually, task orders arose from the expectancy. The subcontract does not limit. If you look at paragraph B4, which is what they argued, was that task orders only are issued under the subcontract. Task orders are not. Task orders are at the end of the process. But you, in your court filings in state court, you essentially recognize that you had a long history of performing HIP-related task orders through the subcontract. What we recognized was that performance of the task orders is under the subcontract, not the expectancy. The business expectancy has nothing to do with the subcontract. If you look at the course of dealing of all of these documents, which are after the subcontract, right, these all indicate that both L3 and L3 ATI received requests from CERCO on CERCO's own documents to submit bids. They responded to those bids and, in fact, in some instances, they were evaluated as the potential bidder for these. If the subcontract were to, and if, so if, I'm trying to figure out the best way to deal with this. If the subcontract was to be limiting, why wouldn't it be? Counsel has admitted, both in their briefs and below, that Jackson was not a party to the subcontract. They got task orders. And if you look at the affidavit of Mr. McCann, and I'll get you the joint exhibit number in a minute, he was the head of their technology group that was in charge of this. It's JA 4745 through 4749. He says specifically he didn't want L3 to receive information because it would interfere if CERCO was allowed to receive subcontractor competitor packages. The subcontractor competitor packages that he references are EPI, SARA, Gavin Industries, and Jackson, four separate other entities that were not parties to this subcontract. Are you suggesting that the mere submission of bids is enough to garner a business expectancy? Absolutely. Well, the submission of bids plus the track record of having been, as we have alleged in our complaint, we won almost every single bid for about an eight-year period. But that was under the subcontract, wasn't it? No, the expectancy. You're talking about the history of success and work, but all that work was under the subcontract, wasn't it? Well, the performance of the work was under the subcontract, but I am distinguishing between an expectancy and a contract. How? I mean, what is the expectancy for if it isn't for work? Oh, I'm not suggesting it's not for work, Your Honor. And how does the work, where does the work come from? The work ultimately, once it's awarded, like any business expectancy, becomes a contract. But that doesn't mean, in any business expectancy case, you start with an expectancy separate and apart before the contract, all right? So our expectancy didn't come from the subcontract. What it did is it came from the fact, outside of the contract, just like in Dunlap, for example, our expectancy came from our track record and our ability to win these task orders. You're making this allegation under Virginia law, isn't that correct? Excuse me? You're making this allegation under Virginia law? Absolutely. That you have a right apart subcontract, isn't that correct? That's correct. And I'm saying that the expectancy under Virginia law. The business expectancy law under Virginia does not require. Does not require a contract, that's correct, Your Honor. It might be helpful for you to discuss that aspect of your case, because it without giving us some of the basic principles that you're relying on. Okay. So our argument is, Your Honor, without dealing with the facts, and the reason I started with the facts was just to show you that the two named plaintiffs did, in fact, do business with Serco, all right? The Virginia law allows for, Dunlap was only one case, although it's very similar to the case here, which allowed a business conspiracy and found that a business could go forward without breach of contract and where the expectancy did not arise underneath the contract. I mean, aren't you really saying, Mr. Leavitt, and you tell me if I'm wrong. I want to make sure I understand you. Sure. Aren't you saying that the question of business expectancy is a question of legal sufficiency, it goes to the merits, and it's not jurisdictional? That's correct. That's exactly what I'm saying. And the purpose of my wanting to go through these documents, and I apologize if I should have started at a higher level, was just to show you the documents that I believe Justice, Judge Lee overlooked, and had he looked at these documents, he would have seen there clearly had to be an expectancy post the subcontract. Otherwise, why were the parties still doing business? Why was Serco sending RFPs to L3 Communications and L3 ATI if the expectancy can only arise under the subcontract? There would be no reason for that. Could I ask, just following up on Judge Kenyon's question, do you have a Virginia case involving, in which the courts recognized a business expectancy between parties that had never been parties to a contract, in which there had been no contractual relationship? Yes. Buffalo Wings is a case where the parties had never been subject to a relationship, and it was a restaurant, that case, and it was based upon the fact that the Buffalo Wings argued that the customers, they had a loyal customer base, and so the customers would continue to do business with them but for the defendant's action. And there was no contract between Buffalo Wings and its customers. And had never been. There had never been. Not with its customers. It was a restaurant, right? If you look at the, so that's one case as an example, okay? I have others if the court is interested. So in Signature Flight, although there were in fact contracts, if you look at the decision very carefully, it says that the expectancy is based in part on those contracts, not completely. And that's a quote from at page four of the decision that says specifically while the expectancy arose from there were contracts between the parties, that's not the only basis of the expectancy. So expectancy is not required to arise under a contract. There has to be some, I mean, it has to be objectively probable. There's got to be some standard by which you measure expectancy. But as Kenan has hinted at the problem here, potential problem is that you never got to litigate that because Judge Lee treated all this as jurisdiction. That's correct, he did. And so we would argue that they are ultimate, that these issues are inextricably intertwined with the merits. It is a fact-based question. Although Ramirez, which is a Fifth Circuit case, says that expectancy by definition is a fact-based question. I was merely going to show you that if the parties, through the defendant's own documents, did business with both named plaintiffs after the subcontract, there had to be an expectancy. If their own head of this contract recognized both named plaintiffs, both named plaintiffs as a competitor and didn't want to give information, how could we possibly be a competitor with them if we didn't have an expectancy? I'm sorry, Your Honor. Is it, are there any other tort allegations that you are making apart from business expectancy? Yes. And are those treated differently? Yes. Could you elaborate on that a little? So, the, well, we have other causes of action. Our one cause of action, or I shouldn't say, there are other theories. There are multiple causes of action. But we have causes of action for tortious interference with the employee's individual contracts. Justice Alito. You also have business and civil conspiracy. You have trade secrets. Yes, we do. There's a whole lot. We have COCA. We have a conspiracy under the Colorado organized racketeer. Okay, but that's not in front of us today, the Colorado case, is it? Well, only in the sense that it's a cause of action that Judge Lee dismissed without looking at standing relative to those causes of action. There's no, he didn't look at expectancy. He didn't address the other, the tort claims apart from, and he just said that on these, he didn't say that you couldn't have a business expectancy apart from the contract. He simply said, these facts don't support it. But I didn't see where he addressed your non-business expectancy tort claims. I would agree with you, Your Honor. And so I would suggest that that was respectfully an error below. Well, other than suggesting that this was simply the wrong party that was bringing the contract. Well, I think he started and stopped with his analysis of the contribution agreement and his analysis of the subcontract. Even the subcontract, however, if the court will look at the subcontract itself, the subcontract says specifically, it has contradictory language. So it's a joint exhibit 4859. And it does say that it was issued by SI International to L3 services at the top. And the modification mentions L3 services. But if the court would respectfully look at the paragraph below, and I'll read it aloud if I may, this subcontract is made by and between SI International, here and after the prime contractor, and L3 Communications, Titan Corporation, Applied Technologies, J-Corp, a Delaware Corporation subcontractor. The subcontract that he relied upon to prevent my clients from having standing at all, in and of itself, has contradictory language. That would be a merits-based determination. If the contract is irreconcilably ambiguous, why wouldn't you look outside of that contract to determine what the party's actually intended? Which is why I'm saying the party's intended that the business continue with whatever group did continue doing the hemper. This agreement also doesn't even say a consent was required. If you look at that specific agreement. I'm sorry, which agreement are you referring to? I'm sorry, if you still look at that subcontract agreement. The paragraph above says, this modification changes the name of the subcontract at the L3 services based on notification from L3. It doesn't talk about consent. But the language about assignments is pretty clear. It is, except for the fact that the subcontract doesn't mention it. And in fact, the task orders, the RFPs, all issued by CERCO are issued in response to the CERCO request are both to L3 communications and L3 ATI. So either it's an oral waiver of the subcontract provision, or in fact, there was a subcontract expectancy, as in Dunlop, that arose outside of the subcontract. The subcontract only kicks in after the expectancy. Once you get an award, the expectancy is over. So by definition, those are two separate parts of the process. Thank you, Mr. Levitt. You've reserved some time for rebuttal. I did. Thank you. And I'm sorry if I went over you. Not at all. I apologize. I'm sorry. Ms. Miller? Good morning. May it please the court, Amy Miller from McGuire Woods on behalf of the Appalachia CERCO, Inc. And also with me today is Betsy Goodall from McGuire Woods. The court should affirm dismissal of the complaint for two reasons. First, neither of these plaintiffs had standing to bring these claims, because neither plaintiff has suffered the injury that was identified in the complaint. Neither of these plaintiffs was ever a party to the subcontract. Neither of these plaintiffs was ever awarded a task order. And neither of these plaintiffs ever performed a task order under the subcontract. Doesn't that go to the sufficiency of the allegations of their business expectancy? And that's really sort of, I think, the question that needs to be answered here, at least from my perspective, conceptually. Was the trial court really doing this based on the sufficiency of the pleadings in terms of whether the parties had satisfied the requirements of 12B6, as opposed to treating this as a jurisdictional issue? That seems to me to be the elephant in the room that we really need to grapple with. That was a separate issue with plaintiff's complaint. There were many problems. Standing was one of them. There was also failure to state a claim in statute of limitations. And there were multiple motions filed, including 12B6 and Rule 56. But to answer your question with respect to this motion and at oral argument, only the issue of standing, and specifically, which parties were injured as to the allegations in the complaint were addressed by Judge Lee. And he further explained in his reasoning and in his questionings along the way, is if you have a tort, where does the duty come from? Well, the duty comes from the subcontract that's been pled in prior iterations of the claim and certainly task orders in this complaint. But who was a party to that subcontract? Well, let me just, you said the duty comes from the subcontract, but that, I mean, that seems inconsistent with the economic laws doctrine. You can have tort duties that arise outside of a contract. And isn't that what they're alleging? That irrespective of the scope of the contract, because of this history of bidding and other facts, which your colleague on the other side has pointed to, that they had a claim for damages, a claim for tort damages. An expectancy can arise outside of a contract. But in this particular case, there was a contract. And that was the only place where the expectancy arose from. That's your claim. That's your contention. But why shouldn't the other side have an ability to sort of prove up their tort claim? They didn't get very far in this case. For a couple of reasons. First of all, the plain language of the subcontract makes clear that task orders can only be issued out of that subcontract. But let's take, I'm sorry, but take business expectancy, which is kind of, as a catch-off phrase, out of it. There are other claims brought by plaintiffs here apart from expectancy. There are other tort claims. Why don't they survive? They don't survive because precisely the same injury, and that injury is lost task orders, is identified for every single complaint. I'll just give you a couple of examples. And to answer your question more generally, the proper standing question is whether an alleged injury is particularized to these plaintiffs. And here, again, they alleged the same injury for every single count one through 79. Even in count 74 through 78, which alleged tortious interference with confidentiality agreements, which is not the subcontract, they said in the complaint that the injury suffered is that plaintiffs were, quote, harmed after SERCO began awarding task orders to Jackson that L3 otherwise would have received, end quote. And that's right in paragraph 203. Would you argue generally that tort claims wouldn't survive? Are you arguing specifically that these tort claims are cabined by the contract? The way they are pled in the complaint, plaintiffs have tied every single tort claim to the same injury of lost task orders. Another example, the Colorado racketeering allegations in count 72. Plaintiffs allege there, this is the injury, quote, the injuries were the many tens of millions of dollars in task orders that the enterprise members caused to be awarded to Jackson. And that's in paragraph 185. The complaint not only ties each and every one of the counts one through 79 to lost task orders under the subcontract. They also, for each and every count, demand precisely $80 million in damages for each. And again, that's for the loss. When you talk about tortious interference with a business relationship, you don't have to have it predicated on a contract. Now, you're saying the way they pled the case, they were predicated on a contract. But why wasn't it the fact that they had had these prior task orders under the contract? Why wasn't that something that they could plead as part of the tortious interference? In other words, we had this prior relationship as evidenced by getting awarded task orders under the contract. And the defendant tortiously interfered with our existing relationship by taking our employees, by using trade secrets, and by various other tortious methodologies. So why isn't that valid to build on it, although it's a separate cause of action under tort law? So even though a tort can arise outside of a contract, you still have to have an injury. And these plaintiffs never suffered that injury. These plaintiffs were never part of that business relationship. How good is the jurisdictional inquiry, though? It seems to me you are arguing the sufficiency of their pleading. You can't. What helps this jurisdictional? I just don't get it. It's jurisdictional because under the Luan analysis, with the Supreme Court's analysis, you have to have an injury in fact. And the injury has to be particularized to these plaintiffs. And these plaintiffs never suffered the injury that they're discussing in the complaint. They never had the business relationship. They allege, but I think that's confusing to me. It seems to confuse the contract, the task order basis of claims with what I consider the pure tort basis of claims. For example, interference with nondisclosure agreements. Surely they had a relationship with their employees that didn't depend on receiving task orders from CERCA, that they are also claiming were interfered with. And that's severable from their claims about business expectancy under the task orders. But they tie even those claims to the business expectancy under the task orders. For purposes of my question, why aren't they severable? Why isn't the tort claim that we had confidentiality agreements with our employees, why isn't that a separate tort claim that would survive through the contribution agreement? Because even with a tort claim, and again, I'm sorry to be repetitive. You have to have been injured. Why wouldn't they be injured by their own employees not abiding by confidentiality agreements? Because these plaintiffs, these plaintiffs weren't part of that relationship. These plaintiffs aren't the ones that were injured by the alleged breach of those agreements. These plaintiffs didn't suffer the lost task orders. And as they described in the complaint, because of the breach of the employment agreements and so forth, they lost task orders to Jackson that they otherwise would have received. Otherwise would have received is what they've said, and they never received them in the first place. The injury in this case is simply not particularized to these plaintiffs. Well, what about the assignment issue in this case? Could you discuss that for a minute? Certainly. The district court didn't, it seems to me the district court didn't address the issue of whether the causes of action could have been assigned. And that seems to be, to me, a hole in the court's logic. Certainly. The court's opinion, and certainly an oral argument when the court delivered an opinion from the bench, a verbal opinion from the bench, I believe Judge Lee did address that. Under the contribution agreement in 2000. Do you have a record site for that? Because I was just going by the court's written order, and I didn't see anything in it. Certainly. The contribution agreement is JA-2288. And I can draw your attention to a couple of specific paragraphs regarding the causes of action that also did not. No, I'm talking about whether the court ruled on it. No. Oh, I'm sorry. No, I'm talking about where you can find the answer in the record. OK, thank you. So obviously, only assets could be assigned to L-3 ATI where written consent was not required. In the same deal applied to the causes of action, if you look at the contribution agreement at JA-2288 paragraph 5, L-3 ATI had the power to, quote, endorse any claim or right only in relation to the assets, not the delayed assets. And there is a clear distinction in the contribution agreement between assets, which were transferred, assigned, and delayed assets, which were retained and not transferred. And so paragraph 5 of the contribution agreement would address that directly. And that's actually consistent. It actually says in paragraph 3, in addition to paragraph 5, that delayed liabilities remain with L-3 services pending approval of the required consent. And I have one other citation for you. Under the subcontract, that says that neither the subcontract, quote, nor any right or duty under it, unquote, may be assigned without prior written consent by the prime. Aren't causes of action generally pretty freely assignable? So this contribution agreement was governed by New York law. Correct. And under New York law, and this is the Bancarat case, I think it's cited by both parties in the briefs, tort claims do not pass automatically on assignment of a contract without specific language demonstrating intent. And here, you actually have language demonstrating the opposite intent. There is specific language in both paragraph 5 and paragraph 3 with respect to claims and rights and what they called delayed liabilities that expressly remain with L-3 services. So under New York law, that cause of action would not assign automatically absent specific language evidencing intent, which is, again, missing here. And in fact, the opposite intent is stated. Ms. Miller, can we go back to this issue of standing, particularly Article 3 standing? You mentioned the Lujan case. And I guess I'm still a little bit uncertain as to the scope of how strictly the Supreme Court would hold the party to the standing requirements in a Lujan was a classic case involving a plaintiff who challenged governmental action. Here, we have private parties. It's a diversity case. You say that the wrong party and interest has filed a lawsuit. It's not clear how that raises an article 3 standing as opposed to a 12b-6 matter or perhaps something that should be resolved at summary judgment. We would contend there is a 12b-6 problem in addition to a 12b-1 standing. But Judge Liebman didn't rule on that, did he? No, he did not. And we would, it's our position that. We say a 12b-6 problem, if the plaintiff says, I am a party to the contract and a complaint, you don't get the challenge at a 12b-6 stage unless you somehow can attach and file the contract and convince the court that that's incorrect as a matter of law. No, but we would assert it would be completely unnecessary to get to that step. Well, see, it seems to me you're taking a shortcut. You were trying to get the trial court, and you succeeded, at least arguably, in getting the court to just head it off at the pass. This is a clean, clear way to head it off at the pass. But I think what Judge Diaz is saying, you really haven't answered, why is this an issue of Article III standing, as opposed to 12b-6 considerations of the sufficiency of their allegations? That's just, to me, where's the constitutional question of standing presented in this case? Because it is inherently jurisdictional. And the court would not have jurisdiction to hear the case at all, including the 12b-6 arguments, if the proper parties were not before the court. And we believe that determining whether the proper parties come before the court requires the court to litigate a lot of different issues regarding the sufficiency of the pleadings, the accuracy of some of the content of the pleadings. And so how, then, does that not simply devolve into a question of whether the pleadings can stand? Because under a 12b-1 analysis, you can certainly look at jurisdictional facts. And in this particular case, all of the jurisdictional facts that were before the court were undisputed. We actually take issue with counsel's statement at the beginning that the court only looked at one and a half documents. That's not true. He actually looked at 40 separate exhibits. And at least a dozen of them were presented individually at oral argument by counsel. And we do not dispute the existence of any of those documents or the plain language of those documents. We would submit that it is actually undisputed. And Judge Lee properly looked at jurisdictional evidence that was submitted freely. See, I think you're putting the jurisdictional label on it. Judge Lee is calling this an inability to prove an element of their prima facie claim. He's saying that they have not been able to prove their claim of business expectancy. So it just seems to me that on page eight of its order, the court is talking about this, whether the plaintiffs are able to prove their business expectancy allegation. And the court's saying they haven't sufficiently alleged it. So obviously, the district court's opinion can be affirmed on any grounds. But in this particular case, aside from the provisions that were just read, it was clear from the opinion and from the verbal opinion from the bench that Judge Lee did focus and properly focused on the issue of standing and who was injured. When he issues a written order, you're saying that we can rely on his verbal comments from the bench that are different from his order? Well, the transcript is certainly part of the record. And that's all I'm. The written order of judgment is what we've got to rely on, isn't it? Absolutely. And he says on page six, the court finds that each entity fails to prove sufficient evidence of any contractual right or business expectancy. But the judge's order, excuse me, the judge's opinion also talks about the fact that these particular plaintiffs were never parties to the subcontract. And when you don't have the same parties to a subcontract that are the parties to a lawsuit, you inherently have a problem. And in fairness, whether or not the plaintiff's standing does focus on whether the plaintiff has a sufficient stake in the outcome to press the claims presented in the complaint. That is a component of standing. That is exactly right. The Raines case, the United States Supreme Court, made clear that you have to have a personalized stake in the outcome. And despite any language that may have been used in the opinion, that was the focus of the court's analysis and the opinion. Who had the expectancy here? Who was injured? What about the 2008 modification to the contract, which at least injects this L3 communications into the mix as a potential party? Does that mean it was justly entitled to resolve and what seems to be a conflict on the face of the document at this stage of the case? That particular document, the 2008 modification, is actually quite clear on its face. The language of the modification says that L3 Services, Inc. was the new subcontractor, and L3 Services, Inc. is the signatory. And that document also says that the purpose of the modification is to name L3 Services, Inc. as the new subcontractor. What the plaintiffs, excuse me, the appellants are pointing to in this case is a block on that form that uses the phrase, I believe, L3 Communications Titan Corporation. It doesn't say L3 Communications, Inc. It says L3 Communications Titan Corporation, et cetera, which was actually the previous name of L3 Services, Inc. It's not even one of the plaintiffs in this case. I think it's a very misleading pinpoint site by the plaintiffs to certainly does not trump a couple of things. Number one, the plain language of the modification, which says what the intent is and who's the new party and who signed it, but also the subcontract, which makes clear that no modifications can be made, no informal modifications can be made or waiver by CERCO unless it is consented to by CERCO and in writing. We don't think that there's any problem or conflict inherent in that document, that 2008 modification. If anything, it affirms even more that L3 Services was the correct plaintiff. OK, now, Ms. Miller, I think your argument almost illustrates the problem, the Kearns problem. You familiar with Kearns? It says when jurisdictional facts are so intertwined with the merits that it is appropriate for the court to not dispose of it,  why don't, even if we were to say that this is standing rather than a sufficiency question, why don't you have a Kearns problem, that your facts are so intertwined with the standing analysis that the appropriate disposition is on the merits? Well, just because you may have a jurisdictional fact that may also be relevant to a merits question doesn't mean that the jurisdictional fact is not a jurisdiction question. Right, but I'm talking about the court's analysis in Kearns, where it talks about the more prudent course of action is not to simply toss it when things are so complex and so intertwined. But again, we get back to, there shouldn't be any Kearns problem here, because none of the jurisdictional facts are in dispute. The plaintiffs had full and fair opportunity to offer up every fact and document they wanted at what turned out to be somewhat of an evidentiary hearing at oral argument. We did not dispute any of them. In fact, the argument was, look at the plain language of the document. The question is always, in this analysis, who was injured? Who had a personal stake in the outcome? Not the merits question. That was always out there, but that was not argued in the briefs. Don't think it's argued at all in the briefs. Is it, Matt? Does the answer to your question, can the answer to your question to judge Kearns problem be divided? Can you address it in terms of the contract claims on the one hand and the tort claims on the other? I know you don't like the idea that the tort causes of action could survive through the contribution agreement, but address her question, please, about the intertwining of the jurisdictional facts, both in the context of the expectancies arising out of the work orders, which is, as best I can tell, the only source of work orders here, and the other tort claims that are floating out there that the district court didn't specifically address. Right, the tortious interference, the business conspiracy, all of those issues. The interference with the, right, confidentiality agreements, et cetera. So the district court may not have addressed each of those counts individually, but it certainly made statements indicating its intent that it was encompassing all of them collectively, at least counts through 179. But he didn't analyze them separately. And it does appear at least arguable that tort causes of action might have slipped through the sieve of the contribution agreement. And he never addresses it as a separate issue. So Judge Lee did make clear that for all of the counts, the injury was the same. And that really is the most important focus. And if we have to agree with that, then? Well, certainly the court is free to analyze and affirm on any grounds. But I guess I would just take issue with the fact that the court did not address those claims, address them as a group. No, no, please finish your sentence. Oh, OK. It addressed them collectively. And the injury, just like the example I gave in both the racketeering claims and the confidentiality agreement claims, yes, there are separate tort claims that involve other documents or maybe other contracts or the subcontract. But the bottom line is, what is the injury and who suffered that injury? These plaintiffs did not suffer that injury. They never could have because they never performed any work, any work, under the subcontract. And so they should have no expectancy and no standing as to those claims as well. Thank you. OK. Just need to turn this to counsel. Oh, of course. So let me try this quickly. In terms of the assignment of the tort claims, I think the Bankerob case makes it very clear. New York does not require special language. Bankerob says that the overall design and express commercial purposes to assign everything, and in fact, everything was assigned, it would make no sense for L3 services, which was spun off from L3 communications, to retain part of the hemp business. So I think at the very least, any claim before the contribution agreement still is viable, and we should be allowed to move forward on that. And perhaps pressing my luck, I would ask the court to just take a look at, for example, JA 4816, which is a July 1, 2013 letter. It's a letter addressed to Serco. It says, L3 Applied Technologies, Inc., L3 ATI, one of the named plaintiffs, is pleased to submit the enclosed firm price proposal in response to the reference solicitation. That one letter alone should be enough to establish. I'm having a lot of trouble with why a response to a solicitation carries the weight that you attribute to it. Because in order for there to be an expectancy, arises from the ability to gain work, and from- The ability to gain work? So anyone in a universe of recipients of a job posting? No. But in this case, let me put it this way, OK? Maybe I was too broad. We allege in our pleading that all plaintiffs had an expectancy based on their prior performance, the fact that they almost always won the task orders previously. So what I'm saying is that this expectancy- You're now reverting back to the task order under the contract, and what the plaintiffs say is that's exactly where this expectancy comes from. Expectance of the contract is not- It's illusory. It's like an IDIQ. It doesn't- The expectancy doesn't arise under the subcontract. The task orders are only how you perform once there's been an award. And that's crucial. Expectancy is pre-award. It has to be by definition. So if you have an expectancy to do something once, in fact, there is an award- But nobody interferes with your right to seek an award. What you're talking about is the award of the task order under the subcontract. I'm still struggling with the distinction you're trying to make. OK. Then I'll try one more time, and then I'll go back to the assignment.  The expectancy starts with the fact that we had the experience and the fact that we continued to get this business over and over and over again. All right? It culminates in a task order. There is no doubt about that. But the expectancy terminates just like any business expectancy terminates once the task order has arisen. We're claiming their interference, their tortious interference, not their breacher contract, their tortious interference before the task order was awarded. Can't you apply? Can't you seek? Can't you respond to a bid? Are you prohibited from competing? No. No, of course we can. But our point is that they tortiously interfere with the bid process. So before the task order was awarded, they interfered with the task order. They stopped our expectancy from ever becoming a task order. Right. But Ms. Miller is saying, and I'm not sure you've adequately answered it. Go ahead. She's saying these people never did any work under the subcontract. So how can they have an expectancy? Well, my- So join and answer that directly, because I think you've left that unanswered. Because- You haven't. I haven't gotten it. Well, I'm saying that if we were submitting bids, we had an expectancy. We do not believe the expectancy has to be limited just to the subcontract. You're saying it doesn't matter whether you've ever worked under the subcontract. You can still have an expectancy? No. Yes, we are saying that. You can have an expectancy, because the task orders don't create the expectancy. What task orders do is they prevent unauthorized work. If you look at the definition of what a task order does, and they cite paragraph B4, all it says is authorization by task orders. We haven't discussed this specifically, but let me deal with what I believe is the elephant in the room. It says that if you do work without authorization, that you're doing it at your peril. You have to have a task order. Once you've won the award, any verbal task orders you won't get paid on. But look at paragraph B4 of the subcontract. It says specifically that it doesn't deal with expectancies. What it deals with is to prevent unauthorized work, so there's no financial disputes. The subcontract doesn't deal with expectancies. It has nothing to do with expectancies. It has to deal with once an award is made. Once an award is made, then it kicks in. It would have to, because before that time, there's no price in the subcontract. There's no description of the work. Remember, there's no statement of work. If you look at every RFP, it doesn't even mention the subcontract. But again, I would go back to the assignment argument. Either way, I think our arguments before that time period are still valid. If I may finish my sentence, I'm sorry. Of course. Thank you. So anything before 2011, the Bank Arabids case teaches us that we should have those claims, which is the great majority of our case anyway. Thank you very much. Who's glasses? We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, Barbara Milano Keenan, Albert Diaz